IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

INFINITE ENERGY INC.,
A Florida corporation,

        Plaintiff,

v.                                CASE NO.: 1:06cv124-SPM/AK

ECONNERGY ENERGY COMPANY,
INC., A New York corporation,

        Defendant.
_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

      This case results from a failed attempt by Infinite Energy Inc. ("Infinite) to

buy Econnergy Energy Company ("Econnergy") for $73,000,000. Infinite alleges

that Econnergy breached a third and fourth amendment to their merger

agreement by (a) failing to use all commercially reasonable efforts to close the

merger agreement, (b) failing to work toward a supply agreement for the merger

and working on stand-alone supply agreements and financing that were

inconsistent with the merger, and (c) anticipatorily repudiating a fourth

amendment to the merger agreement. Infinite seeks liquidated damages, plus

interest, costs, and additional relief as the court deems proper.

      Econnergy has counterclaimed and alleges that Infinite has breached

provisions of their agreement calling for (a) a covenant not to sue (b) payment of

liquidated damages, (c) and confidentiality. Econnergy also alleges that Infinite made negligent misrepresentations, tortiously interfered with Econnergy's supply contract, and fraudulently induced Econnergy to enter into the third amendment to the merger agreement. Econnergy also seeks declaratory judgment on the meaning of the liquidated damages and holdback provisions of the merger agreement and second and third amendments.

## I. Merger Agreement and Amendments

Econnergy experienced financial problems in late 2004 to early 2005 that affected its ability to continue as a going concern. Econnergy tried to obtain a loan from GE Energy Financial Services, Inc. ("GE"), but was not successful. As a result, in May of 2005, Econnergy published a request for quote looking for buyers of its company. Infinite was one of the companies that responded. Infinite offered significantly more money than any other offeror, but it was understood that Infinite needed to secure financing to close the merger.

On September 30, 2005, Infinite and Econnergy executed an 81-page Agreement and Plan of Merger. Doc. 83-2. The merger agreement contained a November 9, 2005 closing date. Infinite tried to obtain financing through UBS in the amount of $75,000,000. As a condition of obtaining the financing, Infinite needed to arrange for replacement of Econnergy's gas and electrical supplier because Econnergy's existing supplier, Sempra, planned to end its supply agreement with Econnergy by the end of December 2005. The supply agreement was critical to Infinite's ability to obtain financing.

Infinite was unable to secure a supply agreement for Econnergy by November 9, 2005. The parties agreed to extend the deadline to November 16, 2005. The extension was reduced to writing and executed on November 8, 2005, as the First Amendment to Agreement and Plan of Merger. Doc. 83-3.

Infinite was unable to a secure supply agreement for Econnergy by November 16, 2005. The parties agreed to extend the deadline to December 5, 2005, with an extension to December 15, 2005 if, in Econnergy's discretion, Infinite had made substantial progress toward closing. The extension was reduced to writing and executed on November 15, 2005, as the Second Amendment to Agreement and Plan of Merger. Doc. 83-4. The second amendment contained a liquidated damage provision and waiver of claims whereby Infinite agreed to pay Econnergy $7,300,000 million if the closing did not occur within the December 5 deadline or the December 15 extension, and Infinite also agreed to waive any claims, defenses, or setoff rights to its obligation to pay liquidated damages. The second amendment also allowed Econnergy to explore other options, including supply agreements, provided that Econnergy would not enter into any binding agreement before termination of the second amendment. This provision was necessary because Econnergy's existing supply contract with Sempra was to terminate on December 31, 2005. Infinite was unable to secure the supply agreement, but by letter dated December 5, 2005, President and Chief Executive Officer of Econnergy, Saul Horowitz, extended the agreement to December 15, 2005.

Infinite was unable to secure a supply agreement for Econnergy by the December 15, 2005 deadline. Infinite and Econnergy continued to have discussions about a third extension and Econnergy consistently confirmed to Infinite that the agreement was extended, and that it just needed to be put on paper. On January 24, 2006, Infinite and Econnergy executed an agreement for a third extension to February 17, 2006, with an extension to February 28, 2006, if in Econnergy's sole discretion, Infinite had made substantial progress toward closing. The extension was reduced to writing as the Third Amendment to Agreement and Plan of Merger. Doc. 83-6. Under the terms of the third amendment, Econnergy obtained the right to negotiate with suppliers of natural gas and electricity and enter into agreements with such suppliers, to take effect if the closing failed to occur within the deadline, under terms and conditions determined by Econnergy "in its sole discretion." Doc. 83-6 at ¶ 8.D.

During January and February while the third amendment was in place, Econnergy agreed to a series of one month supply contracts with Sempra. Econnergy also began negotiating with Dominion Resources, Inc. ("Dominion') for long-term gas and electric supply. As part of their negotiations, Econnergy requested that Dominion provide draft letters of intent to supply Econnergy alone and to supply a post-merger Infinite and Econnergy entity. According to Infinite, Econnergy delayed negotiations and correspondence with Dominion so the deadline would not be met. According to Econnergy, Infinite disclosed confidential information to Dominion that put Econnergy in a bad light and

caused Dominion to cancel negotiations to supply Econnergy alone.  In the meantime, on February 13, 2006, Infinite signed an extension of its financing agreement with UBS and agreed as part of the extension to reimburse UBS for all costs and expenses associated with the arrangement of the financing.

Infinite was unable to close on February 17, 2006, and alleges that this was in part due to Econnergy's control of supply negotiations.  On February 17, 2006, Econnergy recognized the merger agreement as terminated and refused, despite Infinite's request, to grant an extension through February 28, 2006.  As a result of the termination of the agreement, Econnergy contends that it is entitled under the terms of the third amendment to $2,000,0000 from Infinite, which represents liquidated damages in accordance with the "Holdback" provisions of the merger agreement and the third amendment, and is separate and apart from the $7,300,000 that Infinite paid to Econnergy for failing to close in December pursuant to the second amendment to the merger agreement.

On March 2, 2006, Infinite's President, Darin Cook, sent an e-mail to Econnergy's President and CEO, Saul Horowitz, proposing to extend the merger agreement in exchange for a $3,500,000 increase in the original $73,000,000 purchase price.  Doc. 83-7.  Horowitz responded with a counter-proposal that the purchase price be increased by $4,000,000.  Doc. 83-9.  He estimated a closing date near May 1, 2006.  Doc. 83-9.  The estimate included time for Econnergy to conclude a supply deal and an additional two weeks for Infinite and UBS to finish with financing.  Doc. 83-9.   Horowitz suggested that the parties agree to the

terms now and allow about "2 weeks to finish up our supply agreements and then we can paper up the extension agreement."  Doc. 83-9.  Cook e-mailed Horowitz to accept the proposal.  Doc. 83-10.  Infinite contends that these e-mails constitute a fourth amendment to the merger agreement.  The fourth amendment, however, was never reduced to a formal written agreement and never signed by the parties.

During March of 2006, Econnergy's primary focus became the pursuit of financing from GE and not the pursuit of a gas supply agreement for its merger with Infinite.  In April, in reliance on the proposed merger with Econnergy, Infinite signed an agreement with Amaranth LLC to fund the merger whereby Infinite assumed the obligation to reimburse Amaranth for the costs and expenses.

At the end of March 2006, Cook, Horowitz, and Gary Bondi, a shareholder of Econnergy, confirmed that the merger agreement was extended until two weeks after Econnergy closed on its supply agreement.  Horowitz assured Cook that Econnergy's shareholders, including Credit Suisse First Boston, had agreed to the extension.

On April 11, 2006, Infinite, Econnergy, and UBS met to discuss the status of financing for the merger.  Infinite and UBS informed Econnergy that they were prepared to close the merger by April 30, 2006.  Econnergy verbally confirmed the extension and assured Infinite of its intent to close the merger.

On April 24, 2006, Horowitz e-mailed Cook and expressed Econnergy's desire to independently secure its own supply agreement and financing.

Horowitz stated, "We hope to do that in a way that will be consistent with the opportunity to merge the companies, however, at this time we feel that we need to proceed independently with this process." Doc. 83-14. Cook responded and stated that Infinite will spend no more money trying to close the merger if Econnergy is not committed to do so. Cook advised Horowitz that Econnergy could go ahead with an independent agreement with GE and that Infinite would "either adapt or not buy your company." Doc. 83-16.

On April 10, 2006, Infinite's General Counsel, Jeff Traynham, emailed Econnergy's Chief Financial Officer, Jay Corn, about the fourth extension. Doc. 83-12.

> I know that Darin [Cook] has been talking with Saul [Horowitz] about the potential new deal with Bankers, however, I am looking to finalize the extension for purchase. Can you give me an update on where we stand with that?

Doc. 83-12. On April 26, 2006, Econnergy's in-house counsel, Ben Turin, e-mailed Traynham. Doc. 83-17. His e-mail discussed a proposed meeting between Econnergy, Cook and Infinite's potential acquisition financier, but made clear that Econnergy would not discuss with the financier the status of Econnergy's financing or the status of the potential merger with Infinite. Doc. 83-17. With regard to the fourth extension, Turin wrote:

> We also want to reiterate in writing that the Merger Agreement between Infinite and Econnergy expired by its terms on February 17, 2006.
>
> Additionally, any oral communications which may or may not have taken place between one of our shareholders and Darin regarding

a potential extension of the Merger Agreement to April 30, 2006, did not and could not legally act by itself to extend the merger agreement. In any event, that issue will soon be moot due to the passage of time.

Doc. 83-17.

From these allegations, Infinite contends that during the period of the third amendment Econnergy breached its duty to use commercially reasonable efforts to close the merger agreement and the implied covenant of good faith and fair dealing. Infinite alleges that Econnergy's financial condition had improved and Econnergy became interested in pursing a supply arrangement for itself or obtaining independent financing as a stand-alone company, rather than proceeding with the merger.

Infinite also contends that a fourth amendment of the merger agreement up to May 1, 2006, was created by the e-mails between Infinite's President, Cook, and Econnergy's President and CEO, Horowitz, and ratified by the discussions that ensued. Infinite alleges that the practice of the parties with prior amendments to the Merger Agreement was to "agree now and paper-up an extension later." Doc. 83 at ¶ 21. According to Infinite, if the parties had to wait for a formal agreement to be executed no progress would be made toward closing the merger. During the period of the fourth amendment, Infinite relied on the extension to secure funding with Amaranth. In all, Infinite spend nearly $8,000,000 trying to close the merger. The amount includes $7,300,000 that Infinite deposited toward the purchase price and paid in liquidated damages, as

well as expenses Infinite incurred to obtain financing through UBS and Amaranth. According to Infinite, Turin's e-mail disputing that a fourth amendment was in place is an anticipatory repudiation of the fourth amendment.

Econnergy claims that upon the failure of the merger, Econnergy notified Infinite that it must destroy any materials it received from Econergy in accordance with the terms of the confidentiality provision of the merger agreement. Infinite failed to do so. Econnergy also claims that Infinite repeatedly misrepresented that it could raise the $73,000,000 to close the merger when in fact it had no solid financing agreement in place. In reliance on Infinite's representation that it had financing for the merger, Econnergy allowed its supply agreement with Sempra to terminate and Econnergy had no choice but to enter into a series of one-month supply extensions with Sempra through May 2006, incurring extension fees of approximately $1,400,000.

Econnergy also claims that Infinite interfered with its efforts to secure a long-term supply contract with Dominion and breached the terms of a non-disclosure provision of the merger agreement by requesting and obtaining from Dominion confidential communications between Econnergy and Dominion. Econnergy contends that it is entitled to keep the $7,300,000 that Infinite paid as liquidated damages for Infinite's failure to complete the merger by December 15, 2005, in accordance with the second amendment to the merger agreement. Econnergy also contends that Infinite owes Econnergy the $2,000,000 Holdback in accordance with the third amendment to the merger. Econnergy seeks

attorneys fees and costs, as well as liquidated damages, exemplary damages,

declaratory relief, and additional relief as the Court deems proper.

## II. Discussion

Summary judgment is appropriate when "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The court views the evidence and all factual inferences in the light most

favorable to the nonmoving party, and resolves all reasonable doubts about the

facts in favor of the nonmoving party.  Burton v. City of Belle Glade, 178 F.3d

1175, 1187 (11th Cir. 1999).

If the moving party has satisfied its burden, the burden shifts to the

nonmoving party who must show "that summary judgment would be

inappropriate because there exists a material issue of fact."  Mullins v. Crowell,

228 F.3d 1305, 1313 (11th Cir. 2000).  The basic inquiry is "whether the

evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

### A.     Fourth Amendment to the Merger Agreement

To determine whether the parties agreed to a fourth amendment to the

merger agreement, the Court examines four factors: (1) whether the language of

the agreement indicates that it is binding; (2) whether partial performance has

occurred; (3) whether all the terms of the alleged contract are settled; and (4) whether the agreement is the type that is usually committed to writing.  Adjustrite Sys., Inc. v. GAB Business Services, Inc., 145 F.3d 543, 549 (2nd Cir. 1998).  All four of these factors weigh against Infinite's claim that the parties agreed to be bound by the alleged fourth amendment.

The  e-mails between Infinite's President, Cook, and Econnergy's President and CEO, Horowitz in March 2006 indicate that Infinite and Econnergy were negotiating terms for a possible fourth amendment.  The practice of the parties was to be bound only by fully negotiated and executed agreements, such as the merger agreement and the first, second, and third amendments to it.  The text of the alleged fourth amendment indicates that the amendment still needed to be approved by Credit Suisse First Boston and then formalized in writing. Thus the language of the alleged fourth amendment shows that it was not meant to be binding.

Furthermore, Infinite did not partially perform under the agreement. Partial performance means "(i) conduct that is 'unequivocally referable' to the oral modification, and (ii) [which] conferred some benefit on the party against whom enforcement is being sought."  Club Haven Inv. Co., LLC v. Captial Co. of Am., 160 F.Supp.2d 590, 592 (S.D.N.Y. 2001); see also Tri-County Motors v. Am. Suzuki Motor Corp., 494 F.Supp.2d 161, 171 (E.D. N.Y. 2007).  Here, Infinites agreement to reimburse Amaranth LLC for the costs and expenses

conferred no benefit to Econnergy.[1]  Preparatory acts to facilitate a transaction

do not qualify as partial performance.  <u>Tri-County Motors</u>, 494 F.Supp.2d at 171-

72.

The terms of the alleged fourth amendment were also unsettled.  There

was no set closing deadline.  The course of dealings between the parties and the

liquidated damages imposed for failure to close indicates that the deadline for

closing was an important term of the merger agreement.  The lack of a closing

deadline in the fourth amendment demonstrates that the parties did not intend to

be bound by the fourth amendment.

Finally, the merger agreement is an agreement that is typically reduced to

a formal writing.  In the parties' course of dealings, each time the merger

agreement was extended, the parties executed a formal amendment.  The

merger agreement itself required that extensions be made in writing.  Doc. 83-2

at 78 ¶ 10.11 ("Any agreement on the part of a Party to any extension or waiver

of any provision of this Agreement will be valid only if set forth in an instrument

signed on behalf of such Party.").  The Court recognizes that enforcement of a

---

[1]  In an earlier motion, Econnergy argued that the fourth amendment claim should be dismissed because the fourth amendment was not reduced to writing. In denying the motion, the Court noted that Infinite had alleged sufficient facts to establish equitable estoppel.  The requirements for partial performance and equitable estoppel are not the same.  <u>Club Haven Inv. Co., LLC v. Captial Co. of Am.</u>, 160 F.Supp.2d 590, 592 (S.D.N.Y. 2001).  To establish the equitable estoppel exception, a plaintiff must show: (1) "a party to a written agreement has induced another's significant and substantial reliance upon an oral modification" and (2) "conduct that is not compatible with the underlying written agreement." <u>Id.</u>  Conduct benefitting the other party is not required.  <u>Id.</u>

contractual provision against oral modification and the statute of frauds is subject to an exception for equitable estoppel. Nevertheless, in determining whether the parties intended to be bound by the purported fourth amendment, the lack of a formal, executed amendment demonstrates that there was no intent to be bound.

Given the circumstances surrounding the merger agreement and amendments, the Court finds as a matter of law that Infinite and Econnergy did not intent to be bound by the alleged fourth amendment to the merger agreement. Any reliance Infinite placed on the existence of a binding fourth amendment would not be reasonable. Accordingly, Econnergy's motion for summary judgment on Infinite's fourth amendment claims will be granted.

### B. Third Amendment

Under New York law, the implied covenant of good faith encompasses "any promises which a reasonable person in the position of the promisee would be justified understanding were included" in the agreement and prohibits either party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389 (N.Y. 1995). There cannot be an implied covenant of good faith that "would be inconsistent with other terms of the contractual relationship." Lake Erie Distribs., Inc. v. Martlet Importing Co., 634 N.Y.S.2d 599, 602 (N.Y. App. Div. 1995).

Infinite's claim that Econnergy breached the third amendment of the merger agreement rests on the allegation that Econnergy deliberately delayed

supply negotiations with Dominion so that no supply agreement for the merged

entity could be made by the deadline.  Although Econnergy had under the terms

of the third extension "sole discretion" in <u>approving</u> the terms of any supply

agreement, Econnergy nevertheless had an obligation to <u>pursue</u> a supply

contract in good faith and use all commercially reasonable efforts necessary to

close the merger.  Doc. 83-2 at 59 ¶ 6.5(a).  Failure to do so would be a breach

of the merger agreement.

Infinite alleges that Econnergy's financial condition improved so that the

merger with Infinite was no longer the sole option for Econnergy to sustain itself

as a going concern.  Doc. 83 at 4 ¶ 15.  An e-mail from Saul Horowitz to Gary

Bondi, another Econnergy shareholder, states that Econnergy had telegraphed

to Dominion, at some unknown date but at least by March 21, 2006, that it was

not completely committed to the merger.  Doc. 83-11.  At least as of March 2,

2006, Econnergy perceived that "Dominion had basically pre-approved an Infinite

transaction."  Doc. 83-8.  Although Econnergy disputes these facts, genuine

issues exists for a jury to resolve at trial.  Accordingly, Econnergy's motion for

summary judgment as to the third amendment to the merger agreement will be

denied.

### C.    Declaratory Judgment

Econnergy seeks summary judgment on its claims that the holdback

amount, which was reduced from $7,300,000 to $2,000,000 under the third

amendment of the merger agreement, is separate from the $7,300,000 liquidated

damages provision of the second amendment of the agreement. Econnergy contends that Infinite owes both amounts to Econnergy because Infinite was unable to complete the merger. Infinite makes a plausible argument, however, that the third amendment reduced the holdback amount and remaining balance due on the liquidated damages to $2,000,000 to take into account the payments Infinite had made toward the liquidated damages and to take into account reduced post-closing costs of the merger. The meaning of the provisions are ambiguous and genuine issues of material fact exist. Accordingly, Econnergy's motion for summary judgment and Infinite Energy's motion for summary judgment as to these matters will be denied.

### D. Return of $7.3 Million in Liquidated Damages

In count one of its counterclaim, Econnergy alleges that Infinite has breached the second amendment of the merger agreement by seeking return of the $7,300,000 that Infinite paid to Econnergy as liquidated damages. Although Infinite argues that it is not seeking return of the $7,300,000, this argument is contrary to Infinite's answer to the counterclaim. Infinite also argues that even if it did seek return of the $7,300,000, Econnergy cannot sue for breach of a waiver, as opposed to breach of a covenant not to sue. Genuine issues of material fact exist as to whether Econnergy has an actionable claim against Infinite for breach of a covenant not to sue. Accordingly, Infinite's motion for summary judgment as to this claim will be denied.

### E. Confidentiality Agreement

Econnergy alleges that Infinite breached provisions of its confidentiality agreement by disclosing to Dominion inside information that put Econnergy in a bad light, causing Dominion to cut off supply negotiations. Although Infinite seeks summary judgment on this claim, genuine issues of material fact exist as to whether the information disclosed was covered by the confidentiality agreement, whether Econnergy suffered harm, and whether the expense involved in finding an alternate supply was direct or consequential. Accordingly, Infinite's motion for summary judgment as to this matter will be denied.

### F.    Misrepresentation and Fraudulent Inducement

Econnergy alleges claims for fraud and misrepresentation against Infinite based on Infinite's assertions that it could obtain financing and a supplier to close the merger by the deadline dates. Genuine issues of material fact exist as to whether Econnergy relied on Infinite's assertions of existing facts and whether such reliance was reasonable. Accordingly, Infinite's motion for summary judgment as to this matter will be denied.

### G.    Tortious Interference

Econnergy alleges that Infinite tortiously interfered with the confidentiality provision of the letter of intent between Econnergy and Dominion by asking for and receiving confidential information from Dominion. Genuine issues of material fact exist as to whether the information was confidential and whether Econnergy suffered damages. Accordingly, Infinite's motion for summary judgment as to this claim will be denied.

### III.  Conclusion

Econnergy is entitled to summary judgment on Infinite's fourth amendment claim because there are no genuine issues of material fact concerning the existence of a binding fourth amendment.  As to all other claims, both Infinite and Econnergy make valid arguments that involve genuine issues of material fact. Accordingly, it is

ORDERED AND ADJUDGED:

1.      Infinite's motion for partial summary judgment (doc. 163) is denied.

2.      Econnergy's motion for partial summary judgment (doc. 190) is granted as to Infinite's fourth amendment claim (Count II of the Second Amended Complaint, doc. 83).  Summary judgment is denied as to all other claims.

DONE AND ORDERED this 31st day of March, 2010.


  *s/ Stephan P. Mickle*
Stephan P. Mickle
Chief United States District Judge

CASE NO.: 1:06cv124-SPM/AK